Number 161376 and number 191002, Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund. Before you start your argument, can you give a three or four sentence summation of what the case is about, please? Certainly, Judge Lynch. The case is about whether liability under MIPA, the MPPAA, can be passed through by the implying of the existence of a partnership between Sun Capital Partners. A local brass company is in trouble. Investors invest in it, hoping they can turn it around. They're unsuccessful. The brass company has a large unfunded pension liability. The Teamsters Union comes in and says that liability should fall on the investors. It is supported by the federal government. You are representing the investors and saying, no, that liability cannot fall on you for the reasons you just stated. Thank you, Judge Lynch, and may it please the Court, John O'Quinn, on behalf of the appellants, and I'd like to reserve five minutes. You may have all the time. Thank you. Referring to the District Court's decision, there are at least three fundamental flaws in the decision on summary judgment. First, the Court found that two distinct limited partnership funds have formed a general partnership, permitting pass-through liability to be imposed upon them. The very thing that the funds explicitly disclaimed by instead creating the LLC which purchased Scott Brass. Second, the District Court found that this implied general partnership somehow itself had 100% ownership interest in the LLC, which is necessary to establish common control under the statute. If the implied partnership doesn't own the LLC, then it's not in common control and there can't be a liability. Nothing in the record supports that, and indeed the law is presumptively to the contrary. And the third is that the District Court found that this shadow partnership qualified as a trade or business by implying to it the very activities of the LLC itself and the benefits obtained not by the implied partnership but by the funds. Respectfully, every step of reasoning in that chain is flawed, and an amendment cannot be sustained in the summary judgment pocket. Okay, I'd like you to focus on the second prong of your argument. Judge Lynch, certainly, let me start with the second prong. Even if you assume there's an implied partnership between the two funds, that's not enough to establish withdrawal liability. The implied partnership would have to be in the same control group as Scott Brass. And under the District Court's theory, that means that the implied partnership would have to itself own, directly or indirectly, more than 80% of Scott Brass. Now, the District Court in its decision... So as your client organized these funds, one owned 30% of the company and the other owned 70% of the company. That makes 100%, which is more than 80%. Let's go back to the 80% rule. You have one sentence in your brief that says the 80% rule takes care of this, and then you present no argument whatsoever. Well, I don't think that's fair, Judge Lynch. We referenced this at pages 9, 25, 48 to 49. And what is the argument that you say you have preserved about the 80% rule? I don't read it as a safe harbor for funds making investments. Well, Judge Lynch, I think your question is presupposing the combination of the funds. The funds are unquestionably distinct. Okay, you can say you have to resolve Issue 1 before you can reach Issue 2. Is that the argument you're making? Well, no, Judge Lynch. I think Argument 1 is, of course, a separate argument. My argument is that the theory the District Court has come up with is that Fund 3 and Fund 4, which are distinct legal entities, impliedly created a partnership, and that that implied partnership somehow owns the LLC. But as pointed out in our briefs, and you can see at SJA 33 in the record, the implied partnership doesn't own anything. It is Fund 4 that itself directly owns 70% of the LLC. It is Fund 3, and these are distinct entities. Fund 3 owns 30% of the LLC. So the whole idea of aggregating the two is a way to try to put the 70 and the 30 together, and the District Court was very clear that that's what he was doing in doing this. But ultimately it doesn't succeed because even if you think that there is an implied partnership, that partnership isn't what has any ownership interest. That implied partnership may be out there doing something. I don't think it is at all. I don't think the implied partnership exists. I think it's fundamentally inconsistent with the formation of the LLC, and I think, candidly, I think it would do great violence to our system of corporate law in this country if you could say that you can imply a partnership from the very activities that are being undertaken, either being up to the formation of the LLC or by the LLC itself. It's perfectly theoretically possible that two guys who end up controlling four or five corporate entities get together and say, we want to be in the business of buying failing companies, but we want to avoid incurring any liability for pensions. And we're going to structure it with four or five different corporate layers, and we're going to control everything, including the running of the company. Let me finish. Absolutely. And we're going to determine control of the board of that company. We're going to determine who they hire. We're going to change their operations because if we don't, they're surely going to fail. But if we do that, maybe they will survive and we'll make a very nice profit if they survive. So they set up these companies and they deliberately split ownership between 70% and 30% to avoid the 80% rule. And they do all of this having decided at the beginning that they are going to structure it this way, and then they go on and actually do all of these things. And in the end, it is the control of these two owners of the brass company that enables them to do it, and that control rests two layers above in the corporate structure. That's the theory. One question is whether the facts fit that theory. Another question is whether the theory itself is permissible as a matter of pension liability law. Okay? I agree with the framing of the issue, Judge Lynch. I think that to the extent that you're suggesting that there are two individuals here who are acting in their own interest, that's certainly not the case, and maybe that was meant to be more of a hypothetical. I didn't say anything about acting in their own interest. Sure. If, in fact, they're cooperating and they are partners and they cause all of this to happen. Sure. Judge Lynch, to take a couple of steps back, you have two separate funds. These funds are made up of public and private university funds. They themselves include retirement funds, pension funds, and they don't overlap. They don't entirely overlap. The district court specifically found that they were largely non-overlapping sets of limited partners and largely non-overlapping portfolios of companies. Now, yes, there are human beings who ultimately manage these entities, and some of what you are articulating sounds a little bit like was there a question of whether one could pierce the corporate? No, no, no, no, please. That's not in this case. Counsel, I'd like to ask you. All right. I disagree here. I want to ask a little different question. What is the economic effect of this ruling? Who ultimately is going to pay this liability? Who pays this liability? If this theory succeeds, this liability would ultimately be paid out of some fund three and some fund four. It would ultimately come out of the pockets of the investment that was made by the limited partners, the public universities, the pension funds, and others that invested in the funds just so. And if it's not paid? Well, my question is this. There obviously is no money in these limited partnerships at this point. There's a judgment against them, correct? There's a judgment against these limited partnerships as a result of what the district court did. They're responsible for paying this unfunded liability. My question is what does this do to this entire industry of these limited partnerships? How do they work? Who pays this? What's the result? Yeah, the ultimate result is to chill investment in companies that have pension funds. And I point you to this court's decision in United Electric. This court dealt with an analogous issue there in the context of veil piercing and said that if you took, in this court's words, quote, a free-willing approach, and candidly I think that's a little bit of what the district court did here with respect to implying a partnership, that that would undermine, quote, undermine the predictability of corporate risk-taking and provide a huge disincentive for the investment of venture capital, end quote. That's this court's United Electric decision at page 1093. And there's certainly nothing wrong as this court also recognized in United Electric with corporations which, quote, simply try to limit their overall liability by establishing separately incorporated subsidiaries, and that doesn't transgress legal or ethical norms. Now, this court in the last case before it. Excuse me. Before you go on. Absolutely, Judge Lynch. The next stage to the question Judge Stahl asked is logically and if the limited partnerships are not liable, who is going to provide the money? And it's going to be the federal government through the Pension Benefit Guarantee Corporation to a certain limited extent. They tell us they are running out of money, I've forgotten, ten years, five years, something like that, and they won't have any funds left. And I don't understand the Teamsters Union to have other funds that they're going to put in here. So isn't that the economic choice, there are only two options here? Well, I don't disagree that there is a question of who is going to pay for something at the end of the day. The question is when Congress set up a very detailed regime that specifically created an 80% rule that this person was not. I understood the federal agency, the PBGC, to have adopted an IRS rule that was an 80% rule as opposed to looking to a congressional statute. So can we just be clear? I think they are adopting an IRS regulation as opposed to a statutory definition. They are, Judge Lynch, but just to be clear, when Congress adopted Section 1301B1 and specifically required that what they adopt be coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury, these regulations already existed. The temporary regulations were adopted in 1975. META was adopted in 1980. So Congress knew full well that it was adopting a bright-line rule and indeed as the... Whether it's a bright-line rule is a different matter. I'd like to get, because time is very limited, a more maybe prosaic question, but clearly important to the outcome here, and that's the... Does this imply partnership, a trade, or business? Again, that's very important to the outcome of this case. I'd like your understanding of how Judge Woodlock handled that question. He makes a point of saying that it's well settled that whether a partnership is a trade or business must be resolved at the partnership level, not by looking at the partners. And then to try to identify what's going on at the partnership level, he seems to be saying that these two entities, some Fund 3 and some Fund 4, weren't just investing in the particular LLC that we're involved with here, but there is evidence in the record that they did the same thing with perhaps four, five, or six other LLCs. That is, they were looking for investment opportunities. They created maybe four or five other LLCs like that. And I guess he's saying that these multiple endeavors, that that constitutes the trade or business that is taking place at the implied partnership level, is that your understanding of what he's saying? Judge Lopez, I don't think that's actually what he's saying, because that itself would simply potentially just be making investments in different portfolios. So why does he talk about these multiple endeavors? What's his point? To be candid, I'm not entirely sure, and I do think that he's engaged in cherry-picking, because yes, it's true that there are six entities, six so-called portfolio companies, in which these two funds both made investments, but there were 88 portfolio companies that these two funds made investments with overall. And of the six, it's not like there's a pattern of them all being the same. Some of them were invested 50-50. Some of them, they were different degrees of operational control. But I do think that for purposes of trying to determine there's a trade or business, the court does transgress the partner versus partnership divide, because he looks not at what the benefits were to the implied partnership, but ultimately relies on benefits to the implied partners. And that fundamentally is a legal error that cannot be sustained. So he's doing what he said he should do. He's looking at the economic benefits to the partners and then applying that to the implied partnership to get his trade or business conclusion. That's exactly right, and that's exactly what I think he can't do. Let me. I, too, was puzzled by the reference to the pattern of investment in other companies. But I understood the trade or business ruling to be, look, this brass fixture company was engaged in a trade or business, and this court had held earlier in its law the case that Sun Fund 4 participated with it in a trade or business. We remanded Sun Fund 3, and the district court found both Sun Fund 3 and the implied partnership operated this brass company, personnel decisions, cash in, so on. Actually, I don't know about cash in. So I understood the guts of his ruling not to be about this pattern of investment elsewhere, the ruling on trade or business. We've got two different issues in front of us. But to have to do with the actual running of a company that is self-evidently a trade or business. So am I wrong? So in his opinion on remand, he has two rulings on trade or business. The first is that his conclusion that Sun Fund 3 was a trade or business, and that followed from this court's decision vis-a-vis Sun Fund 4. He then has a separate ruling towards the end of his opinion about whether the implied partnership is a trade or business. Now, candidly, it's a little bit unclear. He acknowledges in his opinion that he's not deciding what the bounds of this implied partnership are. He puts a lot of emphasis on what he characterizes, I think erroneously, as pre-LLC activity. It was actually just pre-acquisition activity. The LLC, as this court noted in its prior opinion, was created months before the acquisition of Sun Scott Brass. But he puts some emphasis on that and then sort of suggests in passing that the implied partnership is then running or responsible for the LLC. And I think that leads to, there's several problems baked into that. One is, to the extent that you think that there was an implied partnership that existed before the creation of the LLC, the creation of the LLC should have brought that to an end. Right. Congress has said, and three circuits have now said, and I don't think you challenged this in your briefing, that we have to look beyond the corporate formalities to get to the reality of the economic substance. If that is so, then your argument doesn't work if factually there was, in fact, an implied partnership. Judge Lynch, the hallmark of having a partnership is an agreement to share. First of all, it can't be created by accident. It has to be intentional. And it has to be an agreement to share in an unrestricted way in profits and losses. The very act of creating the LLC, or it could have been a corporation, the act of creating a corporate entity is, it's not just legal formalism, it is a renouncement that they are going to be sharing in an unrestricted way in profits and losses. And I think it's important to recognize the implication of the district court's theory. If you can say, well, any time two entities talk about making an investment and then they form, whether it's an LLC or a gold-fashioned corporation for which they then buy that investment, that you can imply that there is a shadow partnership that is hovering above that, then that means that anyone who invests in that corporation, they don't have to be a trade or business, they can just be ordinary human beings, they will be subjected to potential withdrawal liability. And that is exactly the kind of chilling investment that this court warned about in United Electric. Now, I do think that if you look back, this court squarely in its prior opinion confronted whether it was a problem for these entities, separate entities, to organize themselves in a way such that neither one would acquire 80% ownership. The court concluded the answer to that question was no, that didn't transgress evade or avoid liability. And this court noted specifically at page 144 that it was, quote, doubtful, doubtful that the purchase of Scott Brass would have occurred if, quote, some fund forward to be 100% owner. Well, to then turn around and say that the very thing this court recognizes, doubtful would have occurred at all, that the parties intended to create some type of implied partnership that then acquired the very thing that it was doubtful they would have acquired 100% ownership with if they had not been able to structure it this way, I think strains credulity. There just can't possibly be the intent. And if you look back at particular cases... You know, that's one of my questions for you. If you look at general partnership law, federal partnership law, the intent of the parties is rather important. On the other hand, we have Congress saying, we want you to disregard state law, corporate formalities, and look at the economic reality regardless of subjective intent. What objectively happened here? Well, let me respond to the first part of your question first. And that is, I don't think that MIPA purports to be a license to ignore corporate forms generally. Now, MIPA absolutely, by its terms, cuts through corporate formalities in a very specific way. And that is where there is... And again, Congress knowingly adopted a standard that was in the regulations at the time, Congress provided that there's a bright line of 80%, which goes not to the issue... If you own 80%, and then you have 12 LLCs or corporations between you and the entity that has withdrawal liability, MIPA is absolutely clear you're going to be liable. And it doesn't matter how many layers of limited liability entities are between you. But if you don't have 80%, then the statute does not contemplate that you're going to have liability. And where Congress wanted to... Let me ask you. There have been references to directors from Congress to ignore corporate formalities and look at the economic realities in making judgments about this withdrawal liability. Is that some form of diluted corporate bail piercing standard? Or to do what Judge Whitlock did, are you saying that he had to engage in the more traditional corporate bail piercing analysis, which he clearly did not do? Are you suggesting that that's what he had to do in order to disregard these corporate formalities and create this general partnership? Judge Lopez, I think that he either had to apply the bail piercing standards that this court articulated in United Electric And he didn't do that. And he didn't do that. He absolutely didn't do that. Or he couldn't engage in a shortcut in terms of saying MIPA allows me to more leniently find the existence of a general partnership than I otherwise could have. Now, I think that even if you apply the standards articulated in Tower and you apply the standards articulated by the Second Circuit in ITEL you cannot find that there is a general partnership here. And the existence of the LLC, it's not just a mere formality, it fundamentally undercuts the existence of the intent that's required. And if that were not the case, then under this idea of looking at economic reality, then by definition, every corporation could be treated as a partnership. By definition, every limited liability could be. We have let you go on. You still have your five minutes, but we'd like to hear from your opponents. And, Judge Lopez, may I make just one final question? And your five minutes, you may. Alright, I'll do that then. Thank you very much. Your Honor, my name is Catherine Campbell, and I'm here with my co-counsel, Melissa Brennan. Counselor, you should structure your argument as you want. I hope at some point you'll deal with the trader business issue that I tried to raise. You don't have to do that at the outset, but I hope you will get to that. The implied partnership as a trader business? Yes. Okay. Actually, why don't you start? And also let me deal with the economic result of if we go with your position. Well, the difficulty in just going right to that is that you have to look at what the implied partnership is. I understand. So the judge looks at a situation where these two funds are not really acting independently. And this Court looked at the general partnership agreements, the limited partnership agreements. Well, doesn't that answer the question when you say they weren't acting independently? You're basing that on the fact that the general partners were the same, but the reality is that the limited partners were totally different with perhaps different investment interests designed differently. However, the management of the limited partnership is in the hands of the limited partnership committee. And the limited partnership committee of both Fund 3 and Fund 4 is run by two gentlemen, Meader and Krauss. So the decisions that are being made by 3 and 4 are not independent decisions. It's these two gentlemen who formed some capital advisors, who formed the two funds, who've decided that at a certain point they're going to co-invest these two funds. But typically in investing, that could be an independent decision that they made that in this particular case, that makes sense, economic sense. But there is no evidence that they made an independent decision, that they were going to do this for Fund 3 and were going to do this for Fund 4. They were just these two gentlemen, and they decided they had a co-investment strategy, that they were when the two funds were in transition, Fund 3 was winding down, Fund 4 was winding up, they decided at that point there needed to be co-investments. And they invested in six LLCs, including Scott Grass. And is your position that if these other LLCs had a similar problem that arose here, these limited partnerships would all be in the same pot? Potentially. Just to give another example of how this is not two funds making independent decisions, if you just even look at the Scott Grass LLC agreement, it's signed on behalf of the three funds. Stephen Liff, who is an employee of Sun Capital Advisors, signs it on behalf of Fund 3. Stephen Liff, who signs it on behalf of Fund 3QP, Stephen Liff signs it on behalf of Fund 4. So it's not just these two gentlemen who are making decisions, who control the management and the running of these two, really they're in charge of these two funds making one decision, but who is representing these three funds? It's the same people. This is not being run independently, at least not with respect to these co-investments. Okay, so get to the trade or business. Well, once you get to the implied partnership in fact or trade or business, you've already found that there is a partnership in fact. The partnership in fact is being run by Fund 3, which the district court found is a trade or business under this court's investment plus ruling, and Fund 4 is a trade or business, which was determined by this court. So what the appellants are saying is that these two trade or business, when they co-invest, they suddenly become not trade or businesses. The activities that they're doing are the same. Counsel, what does it mean to say that the trade or business determination must be resolved at the partnership level, not by looking at this is Jeff Woodlock's language, not by looking at the partners. What you've just been describing is what the part of these two LLCs, what they do, and there are statements in our prior decision about the way in which some Fund 4 in particular operates that permits a trade or business determination to be made there. But you're taking that language and you're saying that the fact that the individual partners were involved in a trade or business ergo this implied partnership is also engaged in a trade or business. When Judge Woodlock himself says that's not the way you're supposed to do the analysis. So I don't understand what allows you to make a partnership for trade or business determinations, everything that these LLCs do. Well, I don't think anybody says that the LLCs are running the businesses. The district court goes through what is the LLC. It's really just a holding company. The LLC was created by the Sun Funds so that they could create the Scott Brass Holding Company which was created to purchase the Sun Brass Inc. So I believe that he described it as nearly a mechanism for coordinating the funds. It has no employees. When you look at what was the economic realities of it, those are the things that this court looked at in the last decision. It's the Sun Funds, it's Leder & Kraus, it's the employees of Scott Sun Capital Advisors that are actually running the show. There is nothing the LLC is really nothing but a shell corporation. I'm just looking at again at Judge Woodlock's decision and again focusing on the partnership. He says that one cannot identify any direct economic benefit on top of the benefits received by the Sun Funds. So if direct economic benefit matters, what is the direct economic benefit at this implied partnership level? What is it? Well, it's an implied partnership. There's no partnership agreement so there's no way to really measure what the direct benefit is to the partnership. But there are direct benefits. The investment plus is this court's mechanism for determining a trade or business. So there is a direct benefit to each of the partners. And I think what Judge Woodlock said that if you look at it from a broader perspective, and I think the PBGC will address this direct benefit as well, this direct benefit question. But what Judge Woodlock does is he looks at it from a broader perspective and he says he finds that the activities of the partnership in pursuit of profits from the new structure was not a mere passive investment because that's really what we're trying to get at here. It was intended to generate profit beyond what an ordinary investor would derive. Well, isn't that normal in all of these arrangements that you're trying to generate profits? There's nothing that's wrong with trying to generate profits, I assume. And that's what every one of these limited partnerships attempts to do. But aren't you introducing enormous uncertainty into this particular area of finance by aggregating these partnerships, limited partnerships who did not expect that they were in business with each other, at least the limited partners didn't think they were. Doesn't that change the equation? Well, I think that it's and I know that the appellants say that this challenges the basic principles of corporate law, but I really think that this is just in the MEPA, the Multi-Employer Pension Plan Amendments Act area, that the policy is that you are protecting employee benefits and you are protecting employee benefit funds. Accept that. But it's a circumscribed ruling. Right, but if you take your position to its ultimate conclusion, no serious investor, I would think, would make the kind of arrangement which was made here to try to resurrect that particular company or any potential unfunded liability. Is that the practical reality of where you are? They would make different arrangements. Yeah, I mean, it can be baked into the sales price, the sale of the company can be made to another union company that participates in the pension fund. There are, I mean, companies are purchased by private equity and the companies can have their own mechanisms other than trying to create layers of corporations that insulate them from liability. There are ways to deal with that unfunded liability. It's sort of in the weeds from an ERISA perspective, but there is a provision in the statute that says if you sell the company to another employer that is participating in the fund or who agrees to participate in the fund, then there is no withdrawal liability. And that happens. I'll get off my trader business hobby horse. I just have one more question. Would you just please describe for me in the most basic way you can, how would you describe the trader business of this implied partnership? What is it? It is to seek out businesses that require turning around, that need intervention in their management and operations, to put together management strategies that will turn these businesses around, to purchase these businesses through an LLC, a holding company. So you are relying from that description on what Chuck says when he talks about the five or six instances where Sun Fund 3 and Sun Fund 4 have come together to do the kind of investing that we see with Sungrass. Is that correct? Is that what you are going at? I thought you were also arguing that the company they took over is involved in a trader business and that they actively managed, they didn't just passively invest. Indeed, they would not have bought this trader business without a business plan to engage in running it. Right. I mean, there are really four factors that the district court looks at. And that is, you asked me to describe what the trader business is, and that's how I would describe it generally. But they also purchase the portfolio company, they take over the board of directors and they don't put one board of directors for one fund and one board of directors for the other fund. They just place two board of directors representing both funds. And the active management that was described by this court is undertaken by both funds. And Judge Whitlock says it's really, you can't speak sensibly about the business model of the funds without describing them as acting together. And they've acted together in this trader business. Okay. Thank you. We'll hear from the government now. Good afternoon, Your Honor. Craig Pleasant on behalf of the United States Government's Pension Benefit Guarantee Corporation. PBC is here today because withdrawal liability is a cornerstone of the multi-employer program and the form over substance fractionalization that the appellants are attempting directly conflicts with the congressional attempt behind ERISA and MEPA. If I could jump into Judge Lopez's questions about trader business, I think that would be helpful. I think the first argument is that, something that Judge Lynch had also pointed out, we have trader businesses on all sides here. We have trader businesses for funds three and four. And below that, a trader business for Scott Brass. In between falls the implied partnership. So it's our primary argument that if you could intersperse these chains with shell companies or implied partnerships that were not also automatically deemed trader businesses, it would be a trivial matter to break the chain on any causation and drastically undercut MEPA. However, even if this court were not to accept that and instead require that this court do, we believe it does. The reason the partnership on its facts stands on its own is because there was clear evidence that the partnership existed outside of the SUN LLC. The district court highlighted the fact that there was a joint investment that exceeded the mere creation of the SUN LLC. Funds three and four never co-invested with non-SUN entities. The funds never disagreed on how to operate. And there was a pattern of joint investment. The court found five joint investments, I believe, in total. The appellants have admitted to seven co-investments and coordinated investments by these funds. SUN funds three and four are not organic creations or individual investors coalescing in the open market by happenstance. But for the promise of total control by SUN, it's not a stretch to argue that these investors would have never on their own invested in these funds. The SUN model is total control in these situations. The multi-employer program currently sits in a net negative position, Your Honor, of $53 billion. Pension funds such as the Teamsters need all the tools ERISA and common law provide in order to stave off some very dire outcomes. The concept of partnership, in fact, aligns perfectly with the purpose of ERISA and the Multi-Employer Pension Plan Amendments Act concept of withdrawal liability. The goal of withdrawal liability as well as employees that are in control with a high bar set on control of over 80 percent ownership are responsible for the financial outcomes of their decision when it comes to any Title IV pension plan. Congress will control their provisions broadly to prevent employers from, amongst other things, fractionalization. And determining if there's a partnership, in fact, requires the fact that it's an intensive investigation we've talked about here today. Can I ask you my same economic question? Yes. Assuming that this decision below is affirmed, what does your agency do in order to collect the funds which are owed? Do you go after individual limited partners? Do you go after the general partners? What do you do? Where do you get the money? Your Honor, in this particular instance, the way the multi-employer program operates, it's not our teamster's funds liability to collect. I'm asking the ultimate question. What happens? It's my understanding they can still go after the individual investors in these funds. You would go after the individual investors? That's correct. I'd like to also speak about the chilling effects that have been raised here in terms of the overall market impact of your ruling potentially here today. First off, I would offer that the same chilling effect argument was raised the last time we were all here in 2013 about how if this Court found that private equity funds could ever be trades or businesses, it would kill the market. It hasn't. These are sophisticated investors who, Your Honor pointed out, are capable of pricing in risk and other factors and structuring their deals accordingly. I would also offer that if this Court finds that private equity funds that are in total control are not liable, it will position the market in that strategic buyers who look to purchase total control through a standard C-Corp or whatever other mechanism they choose, they know they're going to be hit with withdrawal liability. So when they go to price out their risk, they're going to have to price that in accordingly. So if the PV funds are exempt from that, they're going to have an advantage in the market over strategic buyers. I have an issue. In 2013, when I wrote the first opinion, I thought this was an extremely difficult case. And I said in a footnote that it would have been helpful if the agency assigned by Congress to provide some instruction in this area in fact had. It is now six years later. There are no interpretive guidances. There are no rules. Nothing. You're just back here as an amicus. You get no deference out of that. So the court system turns to the federal government for help in sorting through these issues and particularly the issues that Judge Stahl has raised about the effect of perhaps chilling investments in these companies. It is something better assigned to Congress than the courts, and we have nothing from you. Why? Your Honor, our agency in these matters, because things such as partnership and fact are such fact-intensive case-specific issues, our agency has treaded lightly when it comes to creating any sort of rights. So there are no guidelines? There'd have to be guidelines so investors know what it is they can't do. Your Honor, we would offer that the investment plus standard that this court has addressed as well as the common law on partnership and fact provide the guidelines for liability in this case. I don't think that that necessarily is clear, and I do think that whatever we decide in this case will have a very, very important effect on how people view investing in companies which you would like to see survive because of the problem with the unfunded liability and the multi-employer pension funds, which we have many in this country. And I agree with Judge Lynch. I think this is an area where somebody has to take a hard look. Are there any plans to are you just going to rely on the, gosh, it's fact-specific, so we'll leave it to the courts to work out on given facts? Your Honor, I'm not aware of any plans at this point. Okay. Thank you, Your Honor. Thank you, Judge Lynch. I'd like to respond to a number of the points that have been made. But at the outset, Judge Stahl, you're absolutely right to flag that this would create enormous uncertainty. No one can know ex ante whether they will have exposure because they're going to be found to be part of an implied partnership. And that, you know, there was a lot that was said about, well, these are Sun Funds 3 and Sun Funds 4, and they don't invest with other people. That's actually not true. If you look actually at the 2013 appendix in this case at page 414 and 947, it's not true that the funds didn't co-invest with outside investors. And you will find that the theory that was adopted by the District Court is not limited to the fact that Sun Fund 3 and Sun Fund 4, which by the way have different general partners, not the same general partners, but do ultimately in terms of human beings share in management. There's nothing about the District Court's reasoning in this case that is limited to that. It sweeps much more broadly. Similarly, there was a suggestion that effectively what should be going on here is veil piercing on the cheap. I know that suggestion was made, but no party has argued this as veil piercing. And Congress, when it directed us to look at economic reality, did not refer to the separate category of veil piercing. So at least with me, that's a non-starter. My point, Judge Lynch, was simply to say that again, if you look at the 2013 appendix at page 415, what you find is testimony from the individuals who said, quote, we looked at each fund separately. We thought about what made sense for each fund. They were acting in their capacities for each fund. This isn't the case like they argued in the last appeal of taking money out of one pocket and putting it into the other. They have responsibilities in their separate capacities for the separate funds. Let me ask you a question you are not going to want to answer. If there is an affirmance in this case, from your point of view, what should the limiting principles be? Judge Lynch, I don't see how you can affirm and there be a limiting principle. Now, would you answer it? I really can't answer the question because there is not a limiting principle to the district court's rationale. It would be different if the district court had found that the standards that this court articulated in United Electric had been satisfied for purposes of No, no, no. Getting back to veil piercing, that's never been what this case has been about. When you listen to the arguments that the other side makes about the fact that you have the same individuals, that's not an argument that they are acting as partners with themselves. It's an argument drawn from implied partnership law and the federal agency has just told us they are not making regulations because they think implied federal partnership law is adequate to give notice to investors. That's a remarkable thing for them to say, Judge Lynch. If you look at the regulations that actually are in place, when Congress wanted there to be aggregation to add up to 80%, Congress said so. Because the very regulation that Congress referenced, 26 CFR, one point, I'd like to I know Judge LeBlanc has asked your question. I guess I will return to my trader business hobby horse for one final question. I'm looking at Judge LeBlanc's opinion. Let me just say, this is very difficult, complex stuff and I think Judge LeBlanc has wrestled with it admirably and I'm not trying to be critical of him at all by just referring to the opinion that he wrote. He cites, this is back on this direct economic benefit issue and what would be the direct economic benefit to this implied partnership and there's a case citation there, Conners v. Ryan's Coal Company. You look at that case and other cases like it. Those are cases where I think you don't have the incorporated entities that we have here. What you have are individuals. You have married couples and you're trying to sort out how businesses that they run and how the economic benefits of those businesses should be attributed to them as individuals. It seems to me that to refer to a case like that to support this notion that the economic benefits realized by these separate LLCs can be attributed to the partnership ignores the fact that we're dealing with corporate entities here. I assume you're going to agree with that. He argued it in his brief. I do and in fact what's going on in those cases Judge Lopez is typical fact pattern is you actually have an incorporated trucking business. You have an unincorporated leasing business. There you have the horizontal determination that they're in common control which is different than what you have here. I do think that coming back to a point that we were discussing earlier both Ryan's Coal and the Ninth Circuit's decision in H.F. Second at 10-15 both of them presuppose that it was a choice to operate as a joint venture or an implied partnership as opposed to a different form. In fact H.F. Johnson specifically says the decision to forego the benefits of incorporation and to establish Lockwood as a joint venture was presumably made for business reasons and for their personal benefit but that meant that the partners were personally liable for Lockwood's withdrawal obligation. There was a choice. Here the choice was made to establish limited liability entities just like corporations. I believe what you're arguing, correct me if I'm wrong, is that even though these two individuals and the common management committee may have made some choices, the limited partners did not. Is that your argument? Well the limited partners didn't make those choices but my point is actually slightly different. In those cases the partners made the choice to operate as a partnership and to forego the benefits of creating a limited liability entity. Here the two funds made the choice to create the limited liability entity and operate through that. That's the very choice that H.F. Johnson says that the partners, the joint venturers, didn't make and why they could be held liable for withdrawal liability. So on that theory this liability can never be imposed as long as there is a state law limited liability partnership that is created. That surely can't be right. No, that's not my point. My point is that this liability can't be imposed by aggregating interests and calling people partners. And the point I was trying to make earlier is that Congress acknowledged that there were times that you could aggregate the regulation at 1.4% The way I read the 80% rule is after 80% to 100% you're on the hook no matter what. It's not a fail safe if you are below 80%. There you can still apply the economic reality test. Are you disputing that? I'm saying that is the upshot of the court's position. Are you disputing that as a proposition of law because your brief certainly doesn't do that. I am disputing that where parties have formed entities that disclaim forming the very liability And they split into 70 and 30 to give themselves 100% control. Judge Lynch, they would have had 100% control if they had just done 70%. The point here is that this really is a conflict. They didn't manage the company through the 70% ownership. They managed it through both of the funds with 100% ownership. But that's because they agreed to invest with somebody else. But the fact is that all the things, what you're doing if you adopt the district court's theory is number one creating incentives to just simply buy less than 80% as a single entity. Now I guess you could say well at that point you've now implied a partnership between the entity that you bought from. That gets to the perniciousness of this theory. There is no end to it. But you are definitely whenever you're talking about there being a pension fund and creating incentives to say it would be better to just let this entity go into bankruptcy. That's what ultimately happened here. The funds lost their entire investment in Sky Brass. They lost what they had invested. And what you were doing by saying that I can go in and I can aggregate these different interests by saying that there's an implied partnership when they have chosen a different form when MIPA doesn't say a word about disregarding those types of forms for this purpose. You absolutely are. Okay. We're hearing again arguments made earlier. Thank you. It's a very difficult case. Thank you very much. Well argued. All rise.